UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

LINDA MOSER,                           )
                                       )
          Plaintiff,                   )          Case. No. 1:18-cv-225-PLR-SKL
                                       )
v.                                     )
                                       )
ETOWAH POLICE DEPARTMENT et al.,       )
                                       )
          Defendants,                  )

## MEMORANDUM AND ORDER

Before the Court is a motion filed by Defendant Tim Davis, Jr. and joined by City of

Etowah, Tennessee, to exclude the opinion testimony of Daniel R. Gilley [Doc. 65; *see* Doc. 67,

at Page ID # 713]. For the reasons set forth below, the motion will be **GRANTED IN PART** and

**DENIED IN PART**.

## I.     BACKGROUND

Plaintiff Linda Moser filed this action on September 24, 2018 [Doc. 1]. She asserts various

claims pursuant to 42 U.S.C. § 1983 that Defendants violated her constitutional rights under the

Fourth, Fifth, and Fourteenth Amendments through excessive force, false arrest, false

imprisonment, and negligent supervision, as well as state-law claims arising from the same

occurrence [*id.* at Page ID # 5–9].

The following facts are alleged in Plaintiff's complaint, and appear to be undiputed [*see*

Doc. 1; Doc. 42 at Page ID # 352–55; Doc. 39 at Page ID # 262–68]. Plaintiff's claims arise from

an interaction with Etowah Police Department officers on September 27, 2017 [Doc. 1 at Page ID

# 3]. Plaintiff is a 68-year-old woman who lives with her daughter, Johnnie Moser,[1] in Etowah,

---
[1] Her name is sometimes spelled Jonnie in the record [*See, e.g.*, Doc. 1].

Tennessee [*id.*]. On the evening of the incident, her daughter's boyfriend, James Ferguson,[2] was visiting their home [*id.*]. At some point during the night, Johnnie Moser fled from her boyfriend to a neighbor's house after her boyfriend beat her severely [*id.*]. The neighbor, Charles Bearden, called 911 requesting police assistance and flagged down Officer Austin Parton of the Etowah Police Department when he arrived [*id.* at Page ID # 2–3]. Johnnie Moser was inside the neighbor's home and was "covered in blood," and an ambulance was called to treat her [*id.* at Page ID # 3]. Meanwhile, Mr. Ferguson woke Plaintiff for help locating her daughter [*id.*]. Plaintiff arrived at Mr. Bearden's home, and Plaintiff could see her daughter from the front porch [*id.*].

Plaintiff testified in her deposition that Mr. Ferguson had gone into her bedroom and woke her up to ask for help looking for her daughter's car keys [Doc. 38-6 at Page ID # 190–91]. When Plaintiff asked him where her daughter was, Mr. Ferguson pointed her in a direction where he said her daughter had gone [*id.*]. Plaintiff saw the ambulance and ran towards it and to the house where it stopped [*id.* at 191–94]. When she got to the porch, Officer Parton told her at least four times to step away from him and go sit down so that he and the medical team could do their jobs [*id.* at Page ID # 202]. Instead, she remained standing next to Officer Parton [*id.*]. Unbeknownst to Plaintiff, Mr. Ferguson had also come onto the porch [Doc. 38-6 at Page ID # 194]. When Officer Parton began attempting to handcuff Mr. Ferguson, Plaintiff reached out and put her hand on him, insisting that he was arresting the wrong person [*id.* at Page ID # 203–06]. A "scuffling" ensued between Officer Parton and Mr. Ferguson [*id.* at Page ID # 211]. Plaintiff describes that Officer Davis then "grabbed [her] hair from behind," at the nape of the neck, and brought her to the floor of the porch [*id.* at 206–07]. She averred that, afterwards, she was lying on her stomach, with her

---

[2] James Michael Ferguson, is sometimes referred to as Michael Ferguson and other times as James Ferguson in the record [Doc. 39, at 2; *see generally, e.g.*, Doc. 38-6].

face turned sideways, and Officer Davis had "[h]is whole body and his knee" on her back [*id.* at 207–08]. Plaintiff averred that, sometime afterwards, Officer Davis "yanked [her] up" by the arm [*id.* at 208]. Plaintiff's hip was fractured, and she was taken by ambulance to a hospital [*id.* at Page ID # 187; Doc. 38-8 at Page ID # 244 (deposition of Johnnie Moser)].

Officer Parton testified in his deposition that he was in the house investigating and went onto the porch because he "could hear somebody screaming from outside" [Doc. 38-9 at Page ID # 252]. He remembered encountering both Plaintiff and Mr. Ferguson on the porch [*id.*]. He knew that Mr. Ferguson was the suspect because his appearance matched the description Johnnie Moser had given him [*id.* at 253]. Officer Parton testified that he attempted to calm Plaintiff down and separate her from Mr. Ferguson so that he could arrest him, which he considered especially important because of Mr. Ferguson was a "pretty tall guy" [*id.* at 252–54]. He told Plaintiff several times to go sit down on the other side of the porch and he believed she understood his requests, but she did not comply [*id.* at 254]. Officer Parton then reached out and "grabbed [Mr. Ferguson's] right arm" while directing him to put his hands behind his back, with a goal of pushing him around and away from Plaintiff and to a "safer area of the porch" [*id.* at 255]. According to Officer Parton, when he "made initial contact with the suspect, [Plaintiff] reached in" and he saw her grab his right arm and "jerk his arm to a slight degree," holding on even after he tried to push her away with his elbow [*id.* at 255–57]. Officer Parton testified that, after the "slight" jerk, he did not feel Plaintiff on his arm anymore [*id.* at 257–58]. Officer Parton further testified:

> At that point, I spin the subject around or the suspect around. [Plaintiff] continued to follow us around in a circle. I then went to place Mr. Ferguson's hands into handcuffs, about which time I heard something go thump. I didn't look behind me, didn't check behind me. My subject or my focus was the suspect.

[*Id.* at 258].

Officer Davis testified in his deposition that, at that point, Plaintiff stepped between Officer

Parton and Mr. Ferguson and "grab[bed] ahold" of Officer Parton's arm, "trying to pull Officer

Parton and [Ferguson] apart." [Doc. 38-7 at Page ID # 232–33]. Officer Davis further testified

that he then "put [his left] hand on her left upper arm, . . . and [his] right hand on . . . the trapezoidal

area around where her neck and her shoulder meet, and tried to pull them apart." [*Id.*]. According

to Officer Davis, he was able to take Plaintiff to the porch floor on his second attempt [*id.* at 234–

35].

Officer Davis's and Officer Parton's body camera footage also show the event. Officer

Davis's body camera footage ("Davis Video") shows that Officer Parton, Plaintiff, and Mr.

Ferguson were all three standing on the porch when Officer Davis came around to the front of the

house [Davis Video at 10:10; *see* Doc. 40 (manual filing of videos)]. The video shows Officer

Parton reach toward Mr. Ferguson, and Plaintiff then extends her hand toward Officer Parton

[Davis Video at 10:22]. Another officer who had been standing nearby on the porch then begins

to move toward Plaintiff and it appears to be that officer that says, "Ma'am, back" [*id.*]. Plaintiff

is verbally protesting, "No, no, no. He didn't do nothing. Leave him alone. He's with me," as

Officer Davis moves quickly toward and onto the porch [*id.* at 10:22–10:28]. The video does not

clearly show what happens next, except that Plaintiff's lighted cell phone is visible near Officer

Parton's face [*id.* at 10:22–10:31; *see also* Doc. 38-4 (still images from Officer Davis's body

camera footage)]. There is a thump, Plaintiff cries out, "Ow, ow," and Plaintiff is then shown

lying on the porch floor [Davis Video at 10:30–10:32]. Officer Davis tells Plaintiff, "You do not

grab my officer. Do you understand?" [*Id.*]. Plaintiff responds, "Aw, you just hurt my, aw, you

just hurt my leg" and continues saying similar things, as her daughter entreats Officer Davis to

"please get off her" [*id.* at 10:32–10:39]. When Officer Davis instructs her to sit up, she again

begins crying out in pain [*id.* at 10:50–11:20]. Officer Davis then asks someone from the fire department to "check [Plaintiff] out" [*id.* at 11:09–11:27].

Less is visible from Officer Parton's body camera footage ("Parton Video") because the porch is dark [Parton Video at 12:00–13:00]. However, one can hear Plaintiff yell, "Where is she?" twice as she approaches Mr. Bearden's home [*id.* at 11:39–11:43]. Plaintiff then runs onto the porch towards the front door as Officer Parton walks onto the porch from inside the house [*id.* at 11:43–11:47]. Officer Parton speaks with Plaintiff, who stands directly in front of him, facing him and listening to him, but breathing hard and asking questions about her daughter in a panicked tone [*id.* at 11:47–12:25]. Officer Parton asks her multiple times to sit down at another area of the porch, as does an individual who identifies himself as "from the fire department" [*id.* at 12:07–12:25]. She stays standing where she is and calls out, "Charles, what did you do? What happened?" [*Id.* at 12:18–12:21]. Then Officer Parton turns toward Mr. Ferguson, who was standing behind Plaintiff, and directs him, "Turn around." [*Id.* at 12:24–12:25]. Plaintiff is no longer visible in the frame, except that her lighted cell phone is visible between Officer Parton and Mr. Ferguson [*id.* at 12:26–12:28]. Plaintiff's voice is audible as she tries to convince Officer Parton to "leave [Mr. Ferguson] alone" [*id.* at 12:26–12:32]. She continues to yell similar statements, and Officer Parton tells her, "Back up. Back up for a second, okay?" [*Id.* at 12:34–12:36]. Johnnie Moser is then heard to say, "No, get off her. That's my mom," and continues to yell similar statements [*id.* at 12:38–13:06]. Plaintiff then cries out several times, as if in pain [*id.* at 13:00–13:30].

Later, Plaintiff speaks with someone on the porch and states, "He just grabbed me by my hair and threw me down." [*Id.* at 19:10–19:15]. Officer Davis, in speaking with the other officers, explains, "I tried to move her arm and her arm's not moving," then motions to signify that he took

Plaintiff down [*id.* at 12:32–12:41]. Officer Parton then states, "I didn't even feel her on me. I didn't know she was there." [*Id.* at 12:41–12:45]. Officer Davis responds, "She was on your side. She was pulling on you." [*Id.* at 12:45–12:49]. Several minutes later, Officer Parton asks, "Am I bleeding?" and states, "I didn't feel nothing," to which Officer Davis responds, "Your whole triceps's red." [*Id.* at 24:15–24:20]. Officer Parton again states that he did not feel Plaintiff touch him but that he tried to push her away with his elbow and was focused on arresting Mr. Ferguson [*id.* at 24:21–25:20].

Plaintiff was arrested and charged with resisting stop, frisk, halt, arrest, or search and assault on a police officer [Doc. 49-5 at Page ID # 500–01]. She later pled guilty to and was convicted of resisting stop, frisk, halt, arrest, or search in violation of Tennessee Code Annotated 39-16-602 [*id.* at Page ID # 502].

Mr. Gilley's proffered opinion testimony relates to the events described above and to Etowah Police Department's training policies and procedures [Doc. 65-1]. Defendant Davis moved on August 21, 2020 to exclude Mr. Gilley's testimony under Federal Rule of Evidence 702 [Doc. 65]. Defendant City of Etowah joined the motion and filed its own memorandum [Doc. 67]. These Defendants argue that Mr. Gilley is not qualified, that his opinion would not be helpful to the jury, and that his methodology is not reliable [Doc. 65 & Doc. 67]. Plaintiff has responded in opposition to the motion [Doc. 68], and Defendant Davis has replied [Doc. 69]. Defendants' motion is now ripe for review.

## II.      MR. GILLEY'S PROFFERED OPINION TESTIMONY

### A.      Qualifications

Mr. Gilley is a retired sheriff [Doc. 68-3 at Page ID # 764]. He was employed with Bradley County Sheriff's Office in Cleveland, Tennessee, as a patrol deputy in 1975, as chief deputy sheriff

from 1980 to 1987, and as sheriff from 1987 to 2006 [*id.*]. Due to the supervisory positions in which he served, he estimates that the last time he personally arrested anyone was around 1988 or 1989 [Doc. 65-5 at Page ID # 691].

From 1995 to 2002, Mr. Gilley was a member of the Tennessee Peace Officers Standards and Training ("POST") Commission, served one term as Chairman, and was actively POST-certified until 2006, when he left his employment with Bradley County [Doc. 68-3 at Page ID # 766; Doc. 68-2 at Page ID # 756; Doc. 65-3 at Page ID # 664; Doc. 65-5 at Page ID # 697]. He has "participated in law enforcement management training for over fifty (50) law enforcement and social agencies including the Federal Law Enforcement Training Center in Glynco, Georgia" and has "interacted with numerous law enforcement agencies all throughout Southeast Tennessee including McMinn County Tennessee." [Doc. 65-3 at Page ID # 665]. Mr. Gilley estimates that, during his nearly twenty years as sheriff, he personally reviewed, evaluated, and made the ultimate decision on approximately fifty complaints related to officer use of force or excessive force [Doc. 68-1 at Page ID # 752].

Mr. Gilley holds a master's degree in Criminal Justice from the University of Tennessee [Doc. 68-3 at Page ID # 764]. He has served as an adjunct instructor of Law Enforcement Administration, has conducted "Ethics in Law Enforcement Training," and has taught courses in "basic patrol procedures" and various other topics at Cleveland State Community College [*id.* at Page ID # 765; Doc. 65-5 at Page ID 690]. He last taught a semester-long course on "police law enforcement techniques" at Cleveland State Community College in or around 2010 [Doc. 65-5 at Page ID # 689].

More recently, Mr. Gilley taught Criminal Justice as an adjunct instructor at Miller-Motte Technical College from 2014 to 2015 [Doc. 68-3 at Page ID # 774]. From 2016 to 2017, he served

as Chairman of the Criminal Justice Program and lead instructor at Miller-Motte Technical College [*id.*]. In those capacities, Mr. Gilley "taught subjects including Legal Issues of Law Enforcement, Policy [sic] Public Relations, Patrol Procedures, and various other law enforcement topics" [Doc. 65-3 at Page ID # 665]. He especially enjoyed teaching about how constitutional law applies to "law enforcement and the courts" [Doc. 65-5 at Page ID # 687]. Mr. Gilley retired from Miller-Motte Technical College in 2017 and now owns his own private investigation firm [Doc. 68-3 at Page ID # 774].

### B. Methodology

In forming the opinions contained in his report, Mr. Gilley reviewed the following materials: body camera footage from Officers Parton and Davis; dash camera video footage from each of their patrol vehicles; the Uniform Citation issued to Plaintiff; deposition transcripts, with attached exhibits, of Plaintiff, Officer Parton, Officer Davis, and Police Chief Eric Armstrong; the Police and Procedures Manual for Etowah Police Department; and the U.S. Department of Justice Use of Force Continuum [Doc. 65-1 at Page ID # 655–56].

Mr. Gilley's report contains his recitation of the facts. He notes that Plaintiff was "visibly and audibly upset" while speaking with Officer Parton on her neighbor's porch [*id.* at Page ID # 656]. He mentions that Plaintiff expressed her concern to Officer Parton and asked several times to enter the home to check on her daughter [*id.*]. Officer Parton instead instructed Plaintiff to sit down on the porch [*id.*] Meanwhile, Mr. Ferguson had arrived on the porch without announcing his presence and was standing behind and to the right of Plaintiff [*id.*]. Around this time, Officer Davis came around the house to the front and saw Officer Parton, Plaintiff, and Mr. Ferguson, but may have been unable to hear Plaintiff "express[ ] her belief that the owner of the residence[, Mr. Bearden,] may have injured her daughter." [*Id.*].

Mr. Gilley notes that, a few seconds later, Officer Parton reached for Mr. Ferguson's wrist without "mak[ing] any verbal statement as to his intent [*id.*]. Plaintiff, who was holding her cell phone in her left hand, "placed" her right hand on Officer Parton's arm while saying that she believed Officer Parton was arresting the wrong man [*id.* at Page ID # 657]. When Officer Davis saw Plaintiff touch Officer Parton, "he grabbed [Plaintiff] from behind and forcefully brought her to the surface of the porch upon which they were standing" while yelling at her [*id.*]. He adds that, "[w]hile [Plaintiff] was on the ground, she is heard to complain that Officer Davis is hurting her." [*Id.*] He further notes that Officer Davis later handed a note to someone who appeared to be an EMT, and said, "I thought you would understand." [*Id.*; *see* Davis Video at 26:10–26:30 (Officer Davis says, "Between you two, I figured you'd understand.")]. Mr. Gilley further notes that Officer Davis told Plaintiff's family that "he ha[d] to charge her with resisting stop, frisk, halt and arrest, and simple assault on a law enforcement officer" and that he told Officer Parton, "[T]his is not my first old lady." [Doc. 65-1 at Page ID # 657; *see* Doc. 40 (manual filing of Office Parton's body camera video the at hospital ("Parton Video Hospital") at 23:00–26:00)]. That concludes Mr. Gilley's summary of the facts he considered in his report [*see generally* Doc. 65-1 at Page ID # 656–57].

### C. Opinions in Report

Mr. Gilley's report [Doc. 65-1] includes the following opinions related to Officer Davis's use of force against Plaintiff (numbered (16), with subparts, as labeled in the report):

> b. "Officer Davis used more than the minimum amount of force necessary to control Linda Moser and, as such, violated the guidelines for the Etowah Police Department." [*Id.* at Page ID # 658].

> c. "Officer Davis did not attempt a verbal command with Linda Moser, he did not attempt to merely restrain her, and he did not attempt to utilize any tactile techniques to force Linda Moser to relinquish any grip she may have had on the arm of Officer Parton." [*Id.*].

9

d. "Ms. Moser testified in her deposition that she weighed approximately 118 pounds at the time of the incident. Officer Davis weighed, by his account, 280 pounds which means he encountered a woman less than half his size. Officer Davis pulled or threw (the video is difficult to see at this point due to lighting) Linda Moser to the ground with a significant force much greater than necessary to merely remove any interference with Officer Parton." [*Id.*].

e. "The body cam footage and the deposition testimony of Linda Moser are consistent with the conclusion that Officer Davis applied his body weight to Linda Moser while she was on the ground and not a threat to Officer Parton. Linda Moser's verbal statements support that conclusion. Placing weight on a prone, significantly smaller woman, is not the minimum amount of force necessary under the Use of Force Continuum utilized by the Etowah Police Department."[3] [*Id.*].

i. "Officer Davis had a duty to utilize the minimum amount of force necessary to remove Linda Moser from an area of danger and to protect the welfare of Officer Parton. Because of the extreme discrepancy in in [sic] size between Officer Davis and Linda Moser, Officer Davis should have merely physically restrained Linda Moser while providing verbal commands to her. The application of force to her ultimately resulted in her impacting the surface of the porch. The application of body weight to her was not necessary to accomplish any law enforcement purpose and therefore was excessive." [*Id.* at Page ID # 659].

Mr. Gilley's report includes the following opinions related to Etowah Police Department's training or policies and procedures (numbered (16), with subparts, as labeled in the report):

a. "The use of force continuum utilized by the Etowah Police Department is consistent with established law enforcement guidelines[.]" [*Id.* at Page ID # 658].

e. ". . . Placing weight on a prone, significantly smaller woman, is not the minimum amount of force necessary under the Use of Force Continuum utilized by the Etowah Police Department." [*Id.*].

f. "The actions of Officer Davis and Officer Parton reflect a lack of adequate training by the Etowah Police Department." [*Id.*].

g. "Although both Officer Parton and Officer Davis had completed POST certified training academies, the Etowah Police Department maintains no records of the training received by the officers during their employment. Both officers were required to undergo yearly in-service training. However, the substance of that

---

[3] Part of this opinion statement is also listed here as an opinion related to Etowah Police Department's training or policies and procedures.

training is unknown because the Defendant did not maintain records concerning that training." [*Id.* at Page ID # 658–59].

h. "Officer Parton testified in his deposition that he instructed Linda Moser to go sit down because he wanted her out of the way when he attempted to place Michael Ferguson in custody. However, prior to that Officer Parton declined to allow Linda Moser to go into the residence at 406 Tennessee Avenue which would have accomplished that purpose. At that time, Officer Parton had already interviewed the victim, the owner/occupant of the residence, and medical personnel were at the scene. Accordingly, if Officer Parton's law enforcement objective was to remove Linda Moser from the area of danger, allowing her to enter the residence was the appropriate decision. The failure to allow her to leave the area of concern reflects a lack of training with respect to the safety of innocent persons present when an attempt at arrest is being effectuated." [*Id.* at Page ID # 659].

16(j). "The aforementioned actions of Officers Parton and Davis in light of the total absence of training records suggest a lack of appropriate training by the Etowah Police Department." [*Id.* at Page ID # 660].

Finally, Mr. Gilley's report includes the following opinions related to his conclusion, labeled (17), that "[t]he charge of resisting stop frisk halt and arrest and simple assault on a law enforcement officer were not supported by probable cause":

a. The affidavit of complaint signed by Officer Tim Davis is inconsistent with the video and Officer Parton's deposition testimony. Officer Tim Davis testified in his deposition that Linda Moser "jumped on" Officer Parton.

b. Second, at no time did Officer Parton put Linda Davis on notice of what he was planning to do. From the video, it is apparent Linda Davis was attempting to help the officers get the right suspect.

c. Third, it does not appear that Linda Moser used any actual force to prevent the actions of Officer Parton. Although Officer Davis claims there were red marks on the arm of Officer Parton, those marks are not apparent on the body cam footage and no photos have been provided of those red marks.

d. Finally, Officer Parton stated more than once that he was unaware that Linda Moser grabbed his arm as described by Officer Davis.

e. Given the totality of these circumstances, there was a lack of probable cause to charge Linda Moser with the offense brought against her.

[*Id.* (as submitted).]

## III.     STANDARD OF REVIEW

The admissibility of testimony by expert witnesses is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–95 (1993) (construing Rule 702); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (holding that the *Daubert* analysis is applicable to non-scientific expert testimony, such as specialized knowledge and experience). The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702: (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

With respect to the first requirement, courts consider whether the qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract. *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

To determine whether the second requirement of relevance is met, a court must, as a preliminary matter, consider whether the proffered expert testimony is relevant under Rule 401,

which provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Daubert*, 509 U.S. at 591–92 (1993) (citing Fed. R. Evid. 104(a)). The testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue . . . . Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591 (cleaned up). In addition to relevance as defined in Rule 401, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. This aspect of the relevance requirement—described in *Daubert* as "fit"—concerns whether the method on which the testimony is based is scientifically valid for the "pertinent inquiry" in the case. *Id.* !

Reliability, the third requirement, is assessed by the factors set out in Rule 702 itself— whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the principles and methods used were reliably applied. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). In order to be reliable, an expert's testimony must be supported by "'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 595). A reliable expert opinion "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Courts "generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* at 530. Thus, reliability—distinct from "credibility and accuracy"—focuses on the methodology employed rather than the conclusions drawn. *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529); *see also Daubert*, 509 U.S. at 595.

In determining whether expert testimony "is the product of reliable principles and methods," Fed. R. Evid. 702(c), courts may consider whether the methods and principles have been and are capable of being tested, whether they have been subjected to peer review and publication, their known or potential rate of error, and whether they are generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. The inquiry is flexible, and the district court may also consider other factors that bear on the reliability of the expert's testimony. *See Kumho*, 526 U.S. at 149–50 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."); *United States v. Mallory*, 902 F.3d 584, 592–93 (6th Cir. 2018) (noting that all of the factors do not necessarily apply in every case); *see, e.g.*, *Johnson v. Manitowic Boom Trucks, Inc.*, 484 F.3d 426, 434–35 (6th Cir. 2007) (approving consideration of the extent to which an expert's opinion was prepared solely for litigation as a factor in determining its reliability).

"[R]ejection of expert testimony is the exception rather than the rule," *In re Scrap Metal*, 527 F.3d at 530, and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Burgett*, 579 F. App'x at 376 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

A district court may, but need not, hold an evidentiary hearing to aid in the decision of whether to admit expert testimony. *See Kumho*, 526 U.S. at 152.

## IV.    ANALYSIS

As a threshold matter, none of the parties requested a hearing on this motion [*see* Doc. 65 at Page ID # 651; Doc. 67; Doc. 68], and the Court determines that a hearing would not aid in its decision. *See Kumho*, 526 U.S. at 152. As explained below, after carefully reviewing the parties' briefs, Plaintiff's original and revised disclosures of Mr. Gilley's proffered testimony, Mr. Gilley's report, his affidavit, his resume, excerpts of his deposition, and excerpts of dismissed Defendant Eric Armstrong's affidavit submitted by City of Etowah, the Court concludes that some, but not all, of Mr. Gilley's testimony is admissible under Federal Rule of Evidence 702.

### A.    Qualifications

Rule 702 requires the Court first to determine whether Mr. Gilley is qualified "by knowledge, skill, experience, training, or education" to answer the particular questions his opinion purports to answer. *In re Scrap Metal*, 527 F.3d at 529; *Burgett v. Troy-Bilt, LLC*, 579 F. App'x at 376. Mr. Gilley's opinion attempts to answer questions related to the appropriate way for law-enforcement officers to interact with suspects before and while making an arrest, including the appropriate use of force, as well as adequate training for law enforcement.

Two Sixth Circuit cases are particularly instructive as to when individuals with law-enforcement experience qualify as opinion witnesses for the purposes of Rule 702: *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), and *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004). The Sixth Circuit distinguished the "experts" in these two cases as follows:

> The Officers argue that Alpert did not present any specialized knowledge that was reliable or of any assistance to the jury. The Officers rely principally on *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), in which we held that the plaintiff's expert, a so-called specialist in the field of "police policies and practices" was not qualified to speak about the city government's policy of disciplining officers for alleged uses of excessive force. *Id.* at 1348–54. In *Berry*, we stated that "there is no such 'field' as 'police policies and practices,'" mainly because we believed that the concept of such a field as presented by that "expert" was far too broad. *Id.* at

1352. We analogized to the legal profession, stating that labeling the individual in *Berry* as an expert when he did not demonstrate that he had experience in any particular aspect of studying the police was "like declaring an attorney an expert in the 'law.'" *Id.* However, by reasoning that a divorce lawyer was no more an expert on patent law than anyone else, we implicitly recognized that individuals with specialized knowledge could most certainly serve as experts, i.e., patent lawyers can serve as experts in patent law. We did not hold that an individual cannot ever testify as an expert about some aspect of police affairs. Rather, the holding in *Berry* reasoned that unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge. While "police practices" in the broadest sense of the phrase may not be a field, surely criminology is.

Indeed, the chief reason for our decision in *Berry* was that the expert's credentials demonstrated that he had no specific expertise about police activities. He had limited experience, given that he was appointed as a deputy sheriff, a post that required almost no qualifications, and he had been fired twice from the position. Furthermore, he lacked any formal training or experience on the subject of criminology or police actions. Compounding the problem was his ungrounded and methodologically flawed testimony regarding what effect the City of Detroit's procedural shortcomings would have upon the future conduct of 5,000 police officers who would be confronted with a diverse and unpredictable array of situations in which force would be used. . . .

By contrast, the Plaintiffs' expert, Alpert, testified about a discrete aspect of police practices, namely use of excessive force, based upon his particularized knowledge about the area. In contrast to the expert in *Berry,* Alpert's credentials are much more extensive and substantial. Alpert has a PhD in sociology from Washington State University, is employed by the University of South Carolina's Department of Criminology, teaches classes on police procedures and practices, has been involved with federal research funded by the Department of Justice that evaluates the use of force by officers, trains officers in the use of force, works with police departments to create use-of-force policies, has testified before Congress and state legislatures about police policies, and has authored forty to fifty articles on the subject of police procedures, many of which have appeared in peer-reviewed journals. . . . Unlike the expert in *Berry,* Alpert testified about much more specific issues: the continuum of force employed by officers generally, the specific training the Officers received, and Alpert's opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force. The critical difference between testifying about the impact of police policies upon a large group of officers and testifying about the proper actions of individual officers in one discrete situation highlights the inapplicability of *Berry.* Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact. . . . Because Alpert had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had

specialized knowledge, we hold that the district court did not abuse its considerable discretion in admitting Alpert's testimony.

*Champion*, 380 F.3d at 907–09.

Also helpful on this issue is *Alvarado v. Oakland County*, 809 F. Supp.2d 680 (E.D. Mich. 2011), in which a district court precluded some, but not all, expert testimony by a witness who opined on issues related to excessive force. That case involved claims that a deputy used excessive force by pulling the plaintiff from his car and onto the ground during a traffic stop. *Id.* at 682. The district court determined that the expert's qualifications were adequate to testify "on the use of excessive force" [*id.* at 689 n.4].[4] That expert had served as a criminal investigator for twelve years, trained new officers on the use of excessive force, served on police officer disciplinary boards, held a doctorate degree and was employed as a college professor of Criminal Justice, and had taught courses on proper police procedures, including the use of excessive force [*id.*].

Here, Mr. Gilley's qualifications to opine about proper police procedures and the use of force are more similar to those of the witnesses deemed qualified in in *Champion* and *Alvarado* than the one who was not allowed to testify as an opinion witness in *Berry*. Similar to the witnesses in *Champion* and/or *Alvarado*, Mr. Gilley has a graduate degree in criminal justice and has conducted police trainings and taught academic classes on basic patrol procedures and techniques, police public relations, and ethics and constitutional issues in law enforcement [Doc. 68-3 at Page ID # 764-765; Doc. 65-5 at Page ID 687-90; Doc. 68-3 at Page ID # 774; Doc. 65-3 at Page ID # 665]. Furthermore, even without his academic credentials, Mr. Gilley is more qualified than the deputy sheriff in *Berry* in that, in his law-enforcement career, he served as both a patrol deputy and in supervisory positions as chief deputy sheriff and as sheriff [Doc. 68-3 at Page ID # 764].

---

[4] However, the court "significantly cabined" the scope of his testimony, *id.*, as discussed *infra*.

Additionally, Mr. Gilley served as a member of the POST Commission for seven years, including one term as Chairman, working to improve officer training. In these capacities, he "interacted with numerous law enforcement agencies" throughout Southeast Tennessee [Doc. 65-3 at Page ID # 665]. And, during his nearly twenty years as sheriff, he personally reviewed, evaluated, and made the ultimate decision on approximately fifty complaints related to officer use of force or excessive force [Doc. 68-1 at Page ID # 752], a duty which helps qualify him to evaluate, among other things, whether an officer's conduct conforms to the use-of-force continuum accepted in the field.

Defendants press two main arguments for their contention that Mr. Gilley is unqualified to tender an opinion on the issues contained in his report. First, they argue that he is unqualified because too much time has passed since Mr. Gilley obtained his relevant experience and training, as well as too much time since he taught classes or trainings on relevant topics [Doc. 66 at Page ID # 700–04]. This assertion wrongly assumes that Mr. Gilley's academic work, which did not end until 2017, is not relevant to his qualifications. Additionally, even assuming *arguendo* that Mr. Gilley had gained no relevant knowledge or experience in many years, Defendants cite no case law supporting the proposition that a witness may not rely upon experience and knowledge earned years, even decades, previously. Such a rule would seem to lead to the counterintuitive outcome that courts would often find people with less experience more qualified to testify as opinion witnesses. Even so, this argument might have had some persuasive force if Defendants had given any reason why Mr. Gilley's knowledge and experience might be obsolete, but they have not argued, for example, that police departments no longer operate according to the policies and procedures with which Mr. Gilley is familiar. Defendants' second argument, which is related to their first, seems to be that Mr. Gilley is not qualified because he is more qualified to opine about

other topics, such as terrorism or law-enforcement administration [Doc. 66 at Page ID 702–03]. Of course, just because Mr. Gilley may be qualified to offer opinion testimony on other topics, it does not follow that he is therefore unqualified to testify on the topics addressed in his report. In sum, the Court finds both of Defendants' arguments unconvincing.

For these reasons, the Court concludes that Plaintiff has satisfied her burden of showing by a preponderance of the evidence that Mr. Gilley is qualified to testify to the opinion proffered. *See Burgett*, 579 F. App'x at 376; *In re Scrap Metal*, 527 F.3d at 529.

### B. Opinions Related to Officer Davis's Use of Force Against Plaintiff

#### i. Relevance

Several of the Mr. Gilley's conclusions related to Officer Davis's conduct are not relevant under Rule 702, in the sense that they will not assist the jury. *See* Fed. R. Evid. 702.

First, Statements 16(b), (d), and part of (i) will not assist the jury because they offer legal conclusions couched as expert opinion. *See Berry*, 25 F.3d at 1342 ("Although an expert's opinion may embrace an ultimate issue to be decided by the trier of fact, the issue embraced must be a factual one."). Each of these statements offers, in different wording, Mr. Gilley's opinion that Officer Davis used more force than was necessary [*see* Doc. 65-1 at Page ID # 658–59].

In *Alvarado v. Oakland County*, the court held that an expert is not permitted to offer an "opinion" that states the applicable legal standards or that constitutes a legal conclusion. 809 F. Supp. 2d at 691–92. The *Alvarado* court precluded expert testimony that the deputy's use of force was excessive, unnecessary, and objectively unreasonable. 809 F. Supp. 2d at 691; *see also DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (holding that the district court properly disregarded expert's legal conclusions that "it was objectively unreasonable for [the officer] to shoot [the suspect]"). Opinions are "inadmissible as legal conclusions" when they

"weigh the evidence, find the facts, apply the law as [the expert] sees it, and resolve the case. These opinions do not assist the jury; rather, they supplant the jury." *Gregg v. Hatmaker*, No. 3:11-CV-348, 2013 WL 7141737, at *4 (E.D. Tenn. Mar. 15, 2013). The *Alvarado* court clarified, on the other hand, that experts may testify "regarding recognized policies and procedures . . . provided that the experts do not express legal conclusions based on their interpretation of the application of those policies in a particular case." *Id.* at 690; *see, e.g.*, *King v. Taylor*, 944 F. Supp. 2d 548, 557 (E.D. Ky. 2013) (allowing expert testimony that the trooper "acted in accordance with his training, accepted policy practices, and that no actions taken by [the trooper] violated any [state] policy and procedure").

Mr. Gilley's conclusions that Officer Davis used more force than necessary are indistinguishable from those deemed inadmissible in *Alvarado* in that they express a legal conclusion, albeit in different wording, about whether Officer Davis used excessive force against Plaintiff. *See* 809 F. Supp. 2d at 691. For that reason, Mr. Gilley will be precluded from testifying to the statements labeled 16(b), 16(d), and the portion of 16(i) that reads: "The application of body weight to her was not necessary to accomplish any law enforcement purpose and therefore was excessive." [*Id.* at Page ID # 659].

Next, Mr. Gilley's statement in 16(c) will not assist the jury because it does not appear to be based on knowledge or expertise outside the understanding of the average juror. *See United States v. Thomas*, 74 F.3d 676, 684 (6th Cir. 1996), *abrogated on other grounds by United States v. Barron*, 940 F.3d 903, 920 (6th Cir. 2019) ("[M]any courts have formulated the [relevance question under Rule 702] as whether expert testimony improperly addresses matters within the understanding or common knowledge of the average juror or invades the province of jury."); *see also United States v. Dunnican*, 961 F.3d 859, 875–76 (6th Cir. 2020). Mr. Gilley opines in

Statement 16(c) that "Officer Davis did not attempt a verbal command with Linda Moser, he did not attempt to merely restrain her, and he did not attempt to utilize any tactile techniques to force Linda Moser to relinquish any grip she may have had on the arm of Officer Parton." [Doc. 65-1 at Page ID # 658]. This statement is unhelpful because the jury is fully capable of viewing and hearing the evidence and determining for themselves what Officer Davis attempted, and did not attempt, to do. It is the jury's role to view the evidence and decide what happened, and they are fully equipped to do so, with respect to this issue, without assistance from an opinion witness.

Parts of the remaining statements related to Officer Davis's conduct, 16(e) and 16(i), are relevant in that they will assist the jury. 16(e) states:

> The body cam footage and the deposition testimony of Linda Moser are consistent with the conclusion that Officer Davis applied his body weight to Linda Moser while she was on the ground and not a threat to Officer Parton. Linda Moser's verbal statements support that conclusion. Placing weight on a prone, significantly smaller woman, is not the minimum amount of force necessary under the Use of Force Continuum utilized by the Etowah Police Department." [*Id.*]

The first two sentences are not helpful to the jury in that it attempts to supplant the jury, which is fully capable of weighing the evidence to determine to what extent Officer Davis applied his body weight to Plaintiff when she was lying on the porch floor. However, the third sentence is helpful in that it offers an opinion based on specialized knowledge and experience as to whether applying weight to a prone, smaller person complies with applicable policies and procedures. *Cf. King*, 944 F. Supp. 2d at 557.

Similarly, part of Statement 16(i) contains a helpful opinion. The statement reads:

> Officer Davis had a duty to utilize the minimum amount of force necessary to remove Linda Moser from an area of danger and to protect the welfare of Officer Parton. Because of the extreme discrepancy in in [sic] size between Officer Davis and Linda Moser, Officer Davis should have merely physically restrained Linda Moser while providing verbal commands to her. The application of force to her ultimately resulted in her impacting the surface of the porch. The application of

body weight to her was not necessary to accomplish any law enforcement purpose
and therefore was excessive.

[Doc. 65-1 at Page ID # 659].   As the Court has already addressed, the last sentence in this
statement is impermissible because it states a legal conclusion.  The third sentence usurps the role
of the jury, since the cause of Plaintiff's impacting the porch is within the realm of everyday
experience.  However, to the extent that Mr. Gilley means "duty" to refer not to a legal duty but to
the duties assigned to him by the Etowah Police Department, the first two sentences are helpful in
informing the jury about proper considerations for an officer and offering ways he could have
complied with the use-of-force continuum utilized by Etowah Police Department.[5]  These two
sentences stop short of offering an impermissible legal conclusion.

### ii.  Reliability

Accordingly, the following two portions of Mr. Gilley's report are admissible as
opinion testimony as long as the Court also deems them reliable:

16(e). "Placing weight on a prone, significantly smaller woman, is not the minimum
amount of force necessary under the Use of Force Continuum utilized by the
Etowah Police Department." [Doc. 65-1 at Page ID # 658].

16(i). "Officer Davis had a duty to utilize the minimum amount of force necessary
to remove Linda Moser from an area of danger and to protect the welfare of Officer
Parton.  Because of the extreme discrepancy in in [sic] size between Officer Davis
and Linda Moser, Officer Davis should have merely physically restrained Linda
Moser while providing verbal commands to her." [*Id.* at Page ID # 659].

Mr. Gilley purports to base the opinions contained in his report on his knowledge and experience
and his review of the evidence in the case, the Police and Procedures Manual for Etowah Police

---

[5] The instant motion has been filed in conjunction with Defendants' motions for summary
judgment [Doc. 38 & Doc. 41] and Plaintiff's response, which relies on the Affadivt of Mr. Gilley
[Doc. 49 at Page ID # 420, 426 & 49-1].  However, should this case proceed to trial, any concerns
that 16(i) refers impermissibly to a legal duty can be addressed through an appropriate motion,
cross-examination, or jury instruction if neceesary.

Department, and the U.S. Department of Justice Use of Force Continuum [Doc. 65-1 at Page ID # 655–56].

An expert opinion must be supported by "more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (quoting *Pomella v. Regency Coach Lines, Ltd.*, 899 F.Supp. 335, 342 (E.D. Mich. 1995)). An opinion should be excluded if it gives a "slant on the facts that are in the record." *Yancey v. Carson*, No. 3:04-CV-556, 2007 WL 3088232, at *4 (E.D. Tenn. Oct. 19, 2007) (precluding expert testimony that "essentially marshaled the facts in the record which support the plaintiff's position"); *see also DeMerrell*, 206 F. App'x at 427 (finding no error where a district court ignored an expert report due to its "refusal to acknowledge the uncontroverted facts").

Furthermore, the opinion "must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005)) (cleaned up); *see also Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999). When "[a] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (quoting *Daubert*, 43 F.3d at 1319); *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (quoting Fed. R. Evid. 702 advisory committee's note).

Officer Davis argues that "Mr. Gilley's opinion does not sufficiently show a sound application of facts through a reliable method" because (1) "he essentially accepts the Plaintiff's

version of events as true" and (2) "[h]is report contains no reference to standards upon which he bases his conclusion." [Doc. 66 at Page ID # 710]. The Court disagrees with both arguments as applied to the portions of 16(e) and 16(i) it has found relevant. These opinions are based on Mr. Gilley's understanding of the policies and procedures in place at the Etowah Police Department and do not depend on Plaintiff's version of events. Although it appears from other portions of Mr. Gilley's report that, from his viewing of the video footage and his review of other materials, he may find aspects of Plaintiff's version more credible than that of Officer Davis, the statements above do not reveal a "slant" on the facts. *Yancey*, 2007 WL 3088232, at *4. The Court finds that the above-quoted portions of 16(e) and (i) show a reliable application of Mr. Gilley's specialized knowledge and experience to the facts in evidence in this case.

### C. Opinions Related to Etowah Police Department's Training or Policies and Procedures

Mr. Gilley's report includes two permissible opinion statements related to Etowah Police Department's training or policies and procedures. The Court has already determined that Statement 16(e) is permissible. The Court will also allow 16(a), which reads: "The use of force continuum utilized by the Etowah Police Department is consistent with established law enforcement guidelines[.]" [Doc. 65-1 at Page ID # 658]. This opinion will be helpful to the jury, and it is reliable in that it is based on Mr. Gilley's application of his knowledge and experience to the Etowah Police Department's policies and procedures, as contained in the manual he reviewed.

However, as City of Etowah has argued, other statements contained in Mr. Gilley's report are unreliable in that they include "inferential gaps" leading to illogical conclusions. *Spears v. Cooper*, No. 1:07-CV-58, 2008 WL 5552336, at *3 (E.D. Tenn. Nov. 17, 2008) ("An expert can draw inferences based upon his or her experience, training, or education in coming to a conclusion, but a court must scrutinize whether inferential gaps between that experience, training, or education

and the conclusion are reasonable."). This flaw dooms the following statements: 16(f), (h),[6] and (j) [*see* Doc. 65-1 at Page ID # 658–60]. All three of these statements assume that Etowah Police Department's training was inadequate based on no evidence other than the actions of Officer Davis and Officer Parton. Of course, such a conclusion requires disregarding alternative explanations, such as that, assuming they acted inappropriately, the officers disregarded or otherwise simply failed to act according to their training. Mr. Gilley offers no rationale for failing to consider that alternative explanation. That failure renders these conclusions unreliable.

Statement 16(g) is not an opinion but rather attempts to bolster the opinions in 16(f), (h), and (j) by stating that Etowah Police Department did not maintain records of their officers' training [*id.* at Page ID # 658–59]. Even if Mr. Gilley's representations about the lack of training records are accurate, which City of Etowah disputes [*see* Doc. 67 at Page ID # 715], it does not follow logically that the officers did not receive adequate and appropriate training. For these reasons, Mr. Gilley will be precluded from testifying to the statements in 16(f), (g), (h), and (j).

### D. Opinions Related to Whether There Was Probable Cause to Support the Charge Against Plaintiff

Finally, Statement 17 and all its subparts relate to Mr. Gilley's conclusion that "[t]he charge of resisting stop frisk halt [sic] and arrest and simple assault on a law enforcement officer were not supported by probable cause." [Doc.65-1 at Page ID # 660]. This is a legal conclusion couched as expert opinion and is, therefore, impermissible. Accordingly, Mr. Gilley will be precluded from testifying to the opinions contained in Statement 17 and all its subparts. *See Berry*, 25 F.3d at 1342.

---

[6] As Officer Parton is no longer a defendant in this case, Mr. Gilley's opinion in 16(h) that Officer Parton acted inappropriately in not allowing Plaintiff to go to her daughter is irrelevant, and the Court need not consider whether it is also unreliable [*see* Doc. 65-1 at Page ID # 659].

## V. CONCLUSION

For the reasons stated above, Defendant Davis's motion to exclude Mr. Gilley's proffered testimony [Doc. 65] is hereby **GRANTED IN PART** and **DENIED IN PART**.  The Court deems Mr. Gilley qualified, but he shall be prohibited from testifying to most opinions contained in his report due to their irrelevance and/or unreliability.  However, Mr. Gilly will be allowed to testify to the following statements, as they are relevant and reliable within the meaning of Rule 702:

> 16(a):  "The use of force continuum utilized by the Etowah Police Department is consistent with established law enforcement guidelines[.]" [Doc. 65-1 at Page ID # 658].

> 16(e). "Placing weight on a prone, significantly smaller woman, is not the minimum amount of force necessary under the Use of Force Continuum utilized by the Etowah Police Department." [Doc. 65-1 at Page ID # 658].

> 16(i). "Officer Davis had a duty to utilize the minimum amount of force necessary to remove Linda Moser from an area of danger and to protect the welfare of Officer Parton.  Because of the extreme discrepancy in in [sic] size between Officer Davis and Linda Moser, Officer Davis should have merely physically restrained Linda Moser while providing verbal commands to her." [*Id.* at Page ID # 659].

SO ORDERED.

ENTER:

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE